<u>In re: Foster Farm</u>, No. 25, September Term, 2024

**RIGHT TO FARM LAWS – NUISANCE – MD. CODE ANN., CTS. & JUD. PROC. 1974, 2020 REPL. VOL.) § 5-403 – TALBOT COUNTY CODE § 128 – GENERALLY ACCEPTED AGRICULTURAL PRACTICE – SUBSTANTIAL EVIDENCE –** Supreme Court of Maryland held that, because Talbot County Agricultural Resolution Board ("Board") did not decide issue with respect to interpretation or application of Maryland's Right to Farm law, Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 5-403, question of whether one-year period for operation of agricultural operation under CJ § 5-403 had elapsed was not before Circuit Court for Talbot County and therefore was not before Appellate Court of Maryland. Board did not determine whether one-year period for operation of agricultural operation under CJ § 5-403 applied; rather, Board decided question of applicability of Talbot County's Right to Farm law, Chapter 128 of Talbot County Code ("TCC"), and whether stockpiling and application of biosolids and soil conditioners supplied by company to farm constituted generally accepted agricultural practices under TCC § 128.

Supreme Court of Maryland held that Board's decision—that applying and stockpiling biosolids and soil conditioners on farm were generally accepted agricultural practices under TCC § 128—is not supported by substantial evidence in record. There was lack of evidence in record and findings by Board to substantiate that practices of stockpiling and using materials on farm and supplying materials to other farms owned or operated by farm owner, or potentially others, are generally accepted agricultural practices under TCC § 128. Board made no findings with respect to public health, safety, and welfare concerning such practices. Board's findings with respect to whether stockpiling materials on farm for use at same location and other farms constitutes generally accepted agricultural practices under TCC § 128 do not reflect that Board fully considered practices at issue and are not supported by substantial evidence in the record.

Supreme Court of Maryland reversed Appellate Court's holding with respect to interpretation and application of CJ § 5-403 and to whether there was substantial evidence to support Board's decision.

Circuit Court for Talbot County
Case No. C-20-CV-22-000143

Argued: January 6, 2025

_____

IN RE: FOSTER FARM

_____

Fader, C.J.
Watts
Biran
Gould
Eaves
Killough,
McDonald, Robert N. (Senior
Justice, Specially Assigned),

JJ.

_____

Opinion by Watts, J.
McDonald, J., concurs.
Eaves and Killough, JJ., dissent.

_____

Filed:  July 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Maryland and Talbot County have Right to Farm ("RTF") laws, codified at Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 5-403 and Chapter 128 of the Talbot County Code ("TCC"), respectively. Both RTF laws have similar purposes and protect agricultural operations and limit nuisance claims against farms. Maryland's RTF statute was originally enacted in 1981 as Md. Code Ann., Cts. & Jud. Proc. (1974, 1980 Repl. Vol., 1980 Supp.) § 5-308 for, among other things, "the purpose of providing that agricultural operations that have been in operation for 1 year or more may not be or become a public or private nuisance" and "to reduce the loss to the State of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance[.]" 1981 Md. Laws 2836-37 (Vol. III, Ch. 763, H.B. 938). Talbot County's RTF ordinance was enacted with the purpose of, among other things, "protect[ing] the right to farm or engage in agricultural interests within Talbot County" and "assist[ing] in the resolution of disputes between agricultural land owners and/or farmers and their neighbors by the establishment of the Talbot County Agricultural Resolution Board [("the Board")] to resolve disputes concerning alleged agricultural nuisances." TCC § 128-1(A).

This case concerns the Board's application of TCC § 128 in resolving nuisance complaints concerning odors and pests allegedly resulting from the use and stockpiling of materials at a farm. On March 24, 2020, Arthur L. Foster, Sr. ("Mr. Foster"), purchased a 423.95-acre farm located at 4084 Smiths Mill Road in Trappe, Maryland in Talbot County

("the Foster Farm"),[1] which he owned and operated until his death on December 31, 2022. Before Mr. Foster's death, his son, Arthur L. Foster, Jr. ("Arthur") was primarily responsible for conducting farm operations, as Mr. Foster was in his 90s. Respondents, Arthur and Terri Phillips (Mr. Foster's daughter), participated in the proceedings in this case, as the co-executors and personal representatives of Mr. Foster's estate.[2] Petitioners, Cheryl Lewis, John Foster, Holly Foster, Molly Routzhan, Michael Burch, Janice Burch, Matthew Holt, Edward Roberts, Karen Roberts, Fred Thompson, and Rosita Thompson, are residents of property near and adjacent to the Foster Farm.

In January 2021, Denali Water Solutions ("Denali")[3] began supplying the Foster Farm with Class A biosolids[4] from Ocean City and soil conditioners, described as including

---

[1]Corn and cover crops are grown at the Foster Farm. Cover cropping is the practice of planting specific crops, such as legumes or grasses, in the off period between growing seasons of a primary commodity or cash crop, such as corn. See Yifei Zhang et al., *Medium-term economic impacts of cover crop adoption in Maryland*, Soil Security, Vol. 17 (Dec. 2024), 100170, at 1, available at https://www.sciencedirect.com/science/article/pii/S2667006224000443.

[2]On March 28, 2023, Respondents filed in the Circuit Court for Talbot County a Notice of Substitution of Parties notifying the court and the other parties that Mr. Foster died on December 31, 2022, and that they, as the personal representatives of his estate, "are the proper persons to be substituted for and in place of Arthur L. Foster, Sr., who continue to maintain farming operations on the property that is the subject of the Petition for Judicial Review."

[3]In a February 2022 memorandum to the Board, Respondents' counsel described Denali as "an organic residuals management company" that "collects water and wastewater residuals, as well as other food processing residuals, and converts them to soil conditioners[.]"

[4]The Class A biosolids consisted of treated wastewater residuals and were supplied by Denali pursuant to a utilization permit issued to Ocean City by the Maryland Department of the Environment for the treatment of sewage sludge. Biosolids that meet pathogen elimination standards set forth in 40 C.F.R. § 503.32(a) qualify as Class A biosolids.

"a blend of Mountaire Millsboro ('Mountaire'), Valley Proteins ('Valley') and Seawatch cake ('Seawatch')[,]"[5] which are regulated by the Maryland Department of Agriculture ("MDA"). These materials were stored on the Foster Farm to be applied to the land on the Foster Farm and other farms that were said to be owned or operated by Respondents.

In September 2021, after Denali began supplying the Foster Farm with the materials, Petitioners filed complaints with the Talbot County Office of Planning and Zoning and the Talbot County Health Department alleging that materials at the Foster Farm were causing offensive odors. As a result of the complaints, Talbot County conducted an investigation. County officials visited the Foster Farm and confirmed the presence of "strong, foul, offensive odors[.]" The County discovered that Denali products were being stored and used on the Foster Farm and were likely the cause of the offensive odors. In November 2021, Petitioners filed complaints pursuant to TCC § 128 with the Board concerning the offensive odors emanating from the Foster Farm.

On February 28, 2022, the Board conducted an evidentiary hearing. After the hearing, while the matter was pending, Petitioners and others filed additional complaints alleging the existence of swarms of flying insects, identified as "midges,"[6] originating from the Foster Farm. The Board consolidated the complaints concerning midges with the

---

[5]According to the Board's opinion (and a February 2022 memorandum to the Board from Respondents' counsel), the Mountaire and Valley soil conditioners consist of poultry processing residuals and the Seawatch soil conditioner consists of processed clam waste.

[6]A "midge" has been defined as "a small fly that flies in groups[.]" *Midge*, Cambridge Dictionary, Cambridge University Press & Assessment (2025), available at https://dictionary.cambridge.org/dictionary/english/midge [https://perma.cc/2G2H-BDHV].

original complaints and conducted an additional hearing for the purpose of deliberation in an open meeting.

On December 14, 2022, the Board issued an opinion titled "Findings and Decision." The Board found that "the application and stockpiling" of Class A biosolids and soil conditioners "during certain times in 2021[] on the Foster Farm" are "generally accepted agricultural practice[s.]" One of the Board members dissented as to whether use of the materials was a generally accepted practice. Among its findings, the Board determined that the Foster Farm is agricultural land under the County's RTF law, TCC § 128-2, which defines agricultural land as real property in Talbot County carried on the State's tax rolls as agricultural land and all other land that has been used as an agricultural operation continuously for one year. The Board explained that "[w]hile Mr. Foster has owned this farm parcel since 2020, he has owned and operated a larger agricultural operation, which includes this farm parcel, for a much longer period of time." In its opinion, the Board did not mention Maryland's RTF law, CJ § 5-403, or make any finding with respect to the statute's requirement of a one-year period for operation of an agricultural operation or its definition of agricultural operation.

Petitioners filed a petition for judicial review in the Circuit Court for Talbot County. On April 20, 2023, the circuit court conducted a hearing on the petition. On June 15, 2023, the circuit court issued a memorandum opinion and order reversing the Board's December 14, 2022 Findings and Decision and remanding the matter to the Board with instructions to find that the agricultural operations on the Foster Farm "were not in existence for one year or more when the complaints were filed," and that the operations do not benefit from

- 4 -

protection under TCC § 128 or CJ § 5-403(c). The circuit court stated that "[CJ] § 5-403(c)'s requirement that the agricultural operation have been in existence for one year applies specifically to the land upon which the operation takes place because the use of the terms 'zoning' and 'nuisance'" in the statute "indicate that the section applies to site specific land use for agricultural operations."[7] According to the circuit court, undisputed evidence showed that Respondents "had not been conducting an agricultural operation on [the] Foster Farm for more than a year before Petitioners began to complain" and that the Board erred in attributing agricultural operations conducted on other property to agricultural operations on the Foster Farm.

Respondents appealed. On May 30, 2024, the Appellate Court of Maryland, in a reported opinion, reversed the judgment of the circuit court and remanded the case to the circuit court with instruction to affirm the Board's decision. See Matter of Lewis, 262 Md. App. 32, 59, 316 A.3d 570, 585-86 (2024). The Appellate Court determined that there was substantial evidence "that the agricultural operation, under CJ[] § 5-403(c), had been under way for one year or more when the first complaints were received." Id. at 57, 316 A.3d at 585. The Appellate Court concluded that "the expanded use of soil conditioners and Class A biosolids at the Foster Farm was a protected activity under CJ[] § 5-403(c) and TCC § 128." Id. at 54, 316 A.3d at 583. The Appellate Court determined that "[t]here was substantial evidence to support the Board's decision that the storage of the biosolids and soil conditioners on the Foster Farm amounted to a protected agricultural operation under

---

[7]In their filings, both parties had referred the circuit court to CJ § 5-403, as well as TCC § 128, with respect to the one-year requirement.

TCC § 128[,]" and that there was substantial evidence that the practices at the Foster Farm did not violate the public health, safety, and welfare of its neighbors or State law. Id. at 55-57, 316 A.3d at 583-84. Petitioners filed a petition for writ of *certiorari* in this Court, which we granted. See Matter of Lewis, 489 Md. 155, 322 A.3d 1257 (2024).

In this Court, Petitioners contend that the Appellate Court erred as a matter of law in its interpretation and application of the one-year provision of CJ § 5-403 and that the statute does not protect an agricultural operation from nuisance liability where the practice at issue has been taking place for less than one year. Petitioners also assert that the Board's decision that the Foster Farm's practices were generally accepted agricultural practices under TCC § 128 is not supported by substantial evidence, and that the Appellate Court failed to consider whether the storage of materials at the Foster Farm for use at other locations changed the nature of the operation of the farm such that it was no longer an agricultural operation subject to protection by RTF laws. According to Respondents, the Board's findings are supported by substantial evidence and the Appellate Court correctly determined that the storage and use of the biosolids and soil conditioners was protected under Maryland's and the County's RTF laws.

We conclude that, because the Board did not decide an issue under CJ § 5-403, no issue with respect to the interpretation and application of CJ § 5-403 was before the circuit court or the Appellate Court. Accordingly, we reverse the holding of the Appellate Court with respect to CJ § 5-403.

For the reasons explained below, we hold that the Board's decision—that applying and stockpiling biosolids and soil conditioners on the Foster Farm were generally accepted

agricultural practices under TCC § 128—is not supported by substantial evidence in the record. We, therefore, reverse the judgment of the Appellate Court.

## BACKGROUND

### RTF Laws

Maryland's RTF law is codified at CJ § 5-403 and protects agricultural operations from nuisance actions if an operation has been under way for a period of 1 year or more, and the operation complies with all applicable government requirements concerning health, environmental, zoning, and permit requirements pertaining to the nuisance claim and is not conducted in a negligent manner. See CJ § 5-403(c). CJ § 5-403(a)(2) defines an "agricultural operation" as "an operation for the processing of agricultural crops or on-farm production, harvesting, or marketing of any agricultural, horticultural, silvicultural, aquacultural, or apicultural product that has been grown, raised, or cultivated by the farmer." CJ § 5-403(c) provides:

> If an agricultural . . . operation has been under way for a period of 1 year or more and if the operation is in compliance with applicable federal, State, and local health, environmental, zoning, and permit requirements relating to any nuisance claim and is not conducted in a negligent manner:
>
> (1) The operation, including any sight, noise, odors, dust, or insects resulting from the operation, may not be deemed to be a public or private nuisance; and
>
> (2) A private action may not be sustained on the grounds that the operation interferes or has interfered with the use or enjoyment of other property, whether public or private.

CJ § 5-403(e) sets forth prerequisites that must be satisfied before a nuisance complaint can be brought in court against an agricultural operation. CJ § 5-403(e)(2)

- 7 -

specifically provides that if a local agency is authorized to hear a nuisance complaint, a person cannot bring a claim in court without filing a complaint with the local agency first. In relevant part, CJ § 5-403(e) states:

> (2) If a local agency is authorized to hear a nuisance complaint against an agricultural . . . operation, a person may not bring a nuisance action against an agricultural . . . operation in any court until:
>
> > (i) The person has filed a complaint with the local agency; and
> >
> > (ii) The local agency has made a decision or recommendation on the complaint.
>
> &ast; &ast; &ast;
>
> (4) If there is no local agency authorized to hear a nuisance complaint against an agricultural operation, a person may not bring a nuisance action against an agricultural operation in any court until:
>
> > (i) The person has referred a complaint to the State Agricultural Mediation Program in the Department of Agriculture under Title 1, Subtitle 1A of the Agriculture Article; and
> >
> > (ii) The Department certifies that mediation has been concluded.

In other words, CJ § 5-403(e) requires that a person who wishes to pursue a nuisance action against an agricultural operation must, before filing an action in court, either file a complaint with a local agency authorized to hear such a nuisance complaint or, if there is no local agency authorized to hear such a complaint, refer the complaint to the Department of Agriculture's mediation program.

Talbot County's RTF ordinance is codified at TCC § 128 and establishes the Board as the local agency authorized to hear such complaints, providing:

> There is hereby established the Talbot County Agricultural Resolution Board ("Board"). The Board shall arbitrate and mediate disputes involving

- 8 -

agricultural operations conducted on agricultural lands and issue findings concerning whether or not such agricultural operations are conducted in a manner consistent with generally accepted agricultural practices.

TCC § 128-4(A).

TCC § 128-2 defines "agricultural land" for purposes of the County's RTF law and includes its own one-year requirement. TCC § 128-2 defines "agricultural land" as "[r]eal property within the boundaries of Talbot County within any zoning classification that is carried on the tax rolls of the State Department of Assessments and Taxation as agricultural land and all other land that has been used as an agricultural operation continuously for one year." TCC § 128-2 defines an "agricultural operation" as:

> The cultivation and tillage of the soil; composting; spraying; production, harvesting and processing of agricultural crops; use of irrigation and spreading of manure, lime, fertilizer, and other soil nutrients and/or improvements; raising poultry and other fowl; production of eggs; production of milk and dairy products; production of fruit, vegetables, ornamentals, and other horticultural crops; aquaculture; production of timber and any commercial agricultural procedure performed as incident to or in conjunction with such operations, including preparation for market, delivery to storage or to market. Also, the use of land for the furtherance of educational and social goals, including but not limited to 4-H clubs, Future Farmers of America (FFA), agritourism and alternative agricultural enterprises, and the like. The term also includes, but is not limited to, all matters set forth in the definition of "agricultural operation" in Courts and Judicial Proceedings Article, § 5-403(a), of the Annotated Code, as amended from time to time; and the production of all matters encompassed within the definition of "farm product" in Md. Code Ann., Agriculture Art., § 10-601(c), as amended from time to time.

TCC § 128-2 defines "generally accepted agricultural practices" as "[m]ethods used in connection with agricultural operations that do not violate applicable federal, state or local laws or public health, safety and welfare and which are generally accepted agricultural practices in the agriculture industry." "Generally accepted agricultural practices include,

- 9 -

but are not limited to, practices that are recognized as best management practices, and methods that are recommended by various governmental agencies, bureaus, and departments, such as the University of Maryland Cooperative Extension, the Talbot Soil Conservation District, and the like." TCC § 128-2.

TCC § 128-3, concerning limitations of actions, provides:

A. A private action may not be sustained with respect to an agricultural operation conducted on agricultural land on the grounds that the agricultural operation interferes or has interfered with the use and enjoyment of property, whether public or private, if the agricultural operation was, at the time the interference is alleged to arise, conducted substantially in accordance with generally accepted agricultural practices.

B. Notwithstanding any provision of this section, no action alleging that an agricultural operation has interfered with the reasonable use or enjoyment of real property or personal well-being may be filed in the Circuit Court if the plaintiff has not sought and obtained a final judgment of the Talbot County Agricultural Resolution Board.

TCC § 128-5(A) provides that "[c]omplaints of nuisances that allegedly affect the reasonable use and enjoyment of property shall be made to the Talbot County Office of Planning and Zoning" and that complaints alleging an impact to public health "also shall be forwarded to the Talbot County Health Department." Upon receipt of a complaint, the Planning Office is to begin an investigation and may enlist professional expertise to clarify issues related to the complaint. See TCC § 128-5(B). Once the investigation is complete, the Planning Office prepares and submits a staff report to the Board. See TCC § 128-5(B). Within 45 days of receipt of the complaint and the Planning Office's staff report, the Board must schedule a formal hearing. See TCC § 128-5(C)(2).

The Board is tasked with deciding "whether the particular agricultural practice does

- 10 -

or does not conform to generally accepted agricultural practices." TCC § 128-5(C)(3). The Board's decision "creates a rebuttable presumption which shall be admissible in evidence in any subsequent civil proceeding in the Circuit Court arising out of the matters set forth in the complaint." TCC § 128-5(C)(3). If the Board finds that the practices alleged in the complaint do "not conform to generally accepted agricultural practices, it may specify and recommend alternative practices which do conform." TCC § 128-5(C)(3). The Board's decision may be appealed to the Circuit Court for Talbot County within 30 days of the decision pursuant to the Maryland Rules governing judicial review of administrative agency decisions, Title 7, Chapter 200, of the Maryland Rules. See TCC § 128-5(C)(5).

## Complaints and Investigation

Beginning in 2021, after Denali had started supplying the Foster Farm with the Class A biosolids and soil conditioners, Petitioners and others filed complaints with the County's Planning Office and Health Department, alleging that the farm was causing offensive odors, which impacted their health and ability to use and enjoy their properties. Ms. Lewis filed with the Planning Office a complaint dated November 23, 2021, pursuant to TCC § 128-5, alleging "nuisance and health hazards caused by the questionable and new practice of utilizing raw sludge, aka bio-solids, from seafood rendering plants, chicken rendering plants, and municipal waste treatment plants for land application on farmland owned by Arthur Foster[.]" Ms. Lewis stated that new practices employed at the Foster Farm produced "noxious odors[,]" which she described as "rotting death," that negatively impacted the reasonable use and enjoyment of her property and her physical and mental health. In addition, Ms. Lewis alleged that the odors caused nausea, sinus burn and

- 11 -

congestion, watering eyes, and headaches, and that she was unable to enjoy the outdoors or open her windows.

In a complaint dated December 9, 2021, Mr. and Mrs. Roberts alleged that the farm was the source of a foul "sickening smell" that "lingers for hours at a time." In a complaint dated December 11, 2021, Mr. and Mrs. Thompson complained about "a very bad foul smell [] coming from the fields" that "takes your breath away when it [] hits your nose and makes it hard to breathe[.]"

In an email dated December 6, 2021, to Mike Duell, the Chief Code Compliance Officer for the Talbot County Code Compliance Office, the Town Administrator/Town Clerk for the Town of Trappe acknowledged that the town had "been receiving complaints almost daily from [] residents due to a very foul odor that has originated from" the Foster Farm. Referring to the Foster Farm, the administrator explained:

> This farmer has allowed the dumping of sludge, consisting of seafood byproducts, chicken byproducts and municipal waste onto their fields and the stench is beyond horrible. The Town office is not near these fields however we can smell it as soon as we open the door. The smell is enough to make you feel sick to your stomach and sinks into your clothes and hair. We are unable to open our windows on nice days because of the smell and have to hold our breath when coming or going from the office.

As a result of the complaints, Mr. Duell and Bill Schmidt, a Licensed Environmental Health Specialist with the Talbot County Health Department's Office of Environmental Health, conducted an investigation and completed a staff report.[8] The staff report included

---

[8]The staff report states that Mr. Schmidt and Mr. Duell conducted a joint investigation in compliance with TCC § 128 in response to a complaint from Ms. Lewis. The staff report provides information about an investigation that occurred from September

the following information. After receiving various calls and emails from residents in Trappe beginning on September 10, 2021, complaining of offensive odors and expressing health concerns, in the same month, Health Department officials confirmed "strong, foul, offensive odors suspected to be originating from the storage and land application of sludge-like materials on a farm property later determined to be owned by Arthur L. Foster." The Health Department learned that Denali was supplying Class A biosolids and Mountaire, Seawatch, and Valley soil conditioners that were applied to the land on the Foster Farm. On September 28, 2021, Mr. Schmidt went to the Foster Farm, where he saw clumps of dark sludge on the Foster Farm fields and found three concrete bunker cells containing large quantities of sludge materials emitting an "extremely foul" odor.

On November 15, 2021, in response to complaints of offensive odors emanating from the farm, a Health Department inspector responded to the area and "smelled a very strong, rank, putrid, nauseating smell." The smell was said to be overpowering and "much worse than the smell from the original complaints." On November 16, 2021, Mr. Schmidt went to the Foster Farm and saw that sludge had been spread on the field and that the strong, pungent odor had worsened at the farm site. On November 17, 2021, Mr. Schmidt received an email from the Nutrient Management Program Administrator at MDA stating that the spreading of material stored at the Foster Farm had been completed on November 15, 2021, and that the material consisted of clam waste and Class A biosolids.

On November 20, 2021, Mr. Duell went to the Foster Farm and saw seepage from

---

14, 2021, to February 23, 2022. At the hearing before the Board, the staff report was admitted as Exhibit 1.

a pile of "brown material that had a heavy crust on top" in one of the bunkers. According to Mr. Duell, the odor from the farm "was very strong" and distinct, and it remained in the county vehicle he was operating even with the windows down as he drove back to his office.

As of December 1, 2021, a strong odor at the Foster Farm was said to be still present and noticeably stronger in the area of the bunkers. On December 8, 2021, Mr. Duell met with Chris Banks, Denali's Regional Operations Manager, at the Foster Farm. Mr. Banks advised that "he [had] visited most of the neighbors in the immediate area and offered minor compensation to them for the discomfort they experienced from the odor." As of December 20, 2021, 17 individual written complaints about the odor had been received. On December 28, 2021, Mr. Schmidt's office learned from MDA that the Seawatch soil conditioner was likely the source of the odor.

As of January 20, 2022, despite requests for contact, Mr. Duell and Mr. Schmidt had received no communication from Arthur or any further communication from Mr. Banks. According to the staff report, "[b]oth parties [we]re viewed as not cooperative in [the] investigation." Because of the lack of cooperation, Mr. Schmidt and Mr. Duell were unable to obtain answers to questions, such as how it had been determined that the Seawatch soil conditioner was the cause of the odor, how Seawatch differs from the other two soil conditioners that were used, where Seawatch had been spread and whether those areas correlated to the strongest odors present, and why Mr. Banks visited neighboring residents uninvited and offered compensation for their discomfort.

On February 23, 2022, Mr. Schmidt and Mr. Duell met with Mr. Banks, Arthur, and

- 14 -

Arthur Foster III at the Foster Farm.[9]  Mr. Banks advised that he was involved in spreading all three soil conditioners and the Class A biosolids on the farm.  Mr. Banks stated that in September 2021, a mix of all three soil conditioners was spread on certain fields and on a different field in November 2021, and that in December 2021, Class A biosolids were also spread across the farm on a section of the property.  As a potential solution to the odor, Mr. Banks and the Fosters proposed taking several actions, which included no longer accepting Seawatch soil conditioner at the Foster Farm or other farms supplied by Denali, not land applying biosolids or soil conditioners on the Foster Farm in 2022 and instead using only commercial fertilizers, and hauling the biosolids and soil conditioners stored at the Foster Farm off site.[10]

### Initial Proceedings Before the Board

On February 28, 2022, the Board conducted an evidentiary hearing.  Prior to the hearing, Respondents' counsel submitted a memorandum to the Board dated February 18, 2022, in which counsel advised that the Class A biosolids used at the Foster Farm are certified by the Maryland Department of the Environment ("MDE"), and that Ocean City had received a "Sewage Sludge Utilization Permit" from MDE that is valid through May 31, 2026, for application of the biosolids to land.  In the memorandum, Respondents' counsel advised that the Foster Farm was purchased in 2020 and that biosolids from Denali

---

[9]Mr. Foster was also present but did not engage in most of the meeting.
[10]According to the report, although several complainants had expressed health concerns as a result of the odors, there had been no health or medical information provided to substantiate that the odors were "creating or causing a condition dangerous to health or safety."

were first supplied to the Foster Farm in January 2021 and were stored at the farm until the land application took place beginning in 2021. According to Respondents' counsel, Denali first land applied the biosolids on March 22, 2021, and applied them again on December 6, 2021, and applied a mixture of the soil conditioners from March 15 to 17, 2021, September 20 to 27, 2021, and November 13 to 14, 2021.

Respondents' counsel advised that the biosolids and a blend of the soil conditioners are stored at the Foster Farm "in containers called 'bunkers' until they can be land applied to the property" and that the farm "does not store any soil conditioners other than those intended to be used on farms owned by the Foster family." Respondents' counsel contended that "land application and storage of food processing and wastewater residuals for use at a farming facility that engages in growing corn and cover crops, is consistent with agricultural operations[,]" that applying the materials is a generally accepted agricultural practice, and that no law or the public health, safety, and welfare had been violated.

At the hearing, complainants testified about the harmful effects of the storage and application of the Class A biosolids and soil conditioners on the Foster Farm. Mr. Burch testified that he and his wife had lived at their home near the Foster Farm for 19 years and that the home had been in their family for 34 years. Mr. Burch described the odor from the Foster Farm as "smelling like rotting meat or death" and stated that the odor was so strong that it made his eyes and sinuses burn, gave him a headache, and made him sick to his stomach. Mr. Burch testified that he and his wife were not able to have their "children or new grandchildren [at their home] for Thanksgiving due to the awful pungent odor that

was present inside[,]" and that Mr. Banks had offered them a gift card to cover Thanksgiving dinner for their "inconvenience[.]"

Another complainant, Dory Gallambert, who had lived in a house on property adjacent to a Foster Farm field for over 20 years, testified that noxious odor from the sludge lasted approximately two months each time it was land applied and that "[t]he odor is so strong that going outside for any activities at all is not possible without feeling nauseous." Ms. Gallambert stated that her children could not play outside, her family could not enjoy being outside, the odor permeates her house, and she and her family experienced dizziness, headaches, and congestion. Another complainant, Brittanie Collier, who had lived in Trappe for 15 years and who owns and operates a farm "right across" from the Foster Farm with her husband testified that her family's ability to go outside was "inhibited" by the "awful, horrendous smell." Ms. Collier testified that her young daughter had vomited due to the smell, and that she was concerned about water contamination and wildlife being negatively impacted.[11]

Mr. Banks testified that, in the fall, he approaches farmers and "offer[s] them a buyout of their cover crop program[,]" if Denali applies the product. Mr. Banks explained that Denali offers farmers "the same amount of money or more [than the State] to buy them out of their cover crop." According to Mr. Banks, a farmer can proceed with planting a cover crop and receiving a certain amount of money from the State for planting a cover crop, but if the farmer chooses to use and store Denali products, the farmer cannot receive

---

[11]Although Ms. Gallambert and Ms. Collier were complainants before the Board, they are not Petitioners in this case.

- 17 -

money for a cover crop and instead Denali "buy[s] them out."

Mr. Duell testified that, during one investigative visit at the Foster Farm, he noticed that a new bunker had been put up "almost overnight," stating:

> But during the course of one visit almost overnight, a concrete precast structure about ten-foot tall, 200 feet long approximately, and approximately 100-foot deep was built on an adjacent pad to one, to the previous bunkers that were holding material at the Foster Farm. This obviously had to cost several hundred or several thousand dollars at the very least.

(Paragraph break omitted). At the hearing, Respondents' counsel advised that Class A biosolids and soil conditioners that would be stored on the Foster Farm "would be removed from the site and applied to other Foster Farm properties." At the conclusion of the hearing, the Board stated that it would issue a written opinion.

### Additional Complaints and Investigation

After the evidentiary hearing, additional complaints were filed about swarms of flying insects, described as "midges," that the complainants believed originated from the Foster Farm. Mr. Duell and Mr. Schmidt prepared a supplemental staff report detailing the investigation undertaken by the County into the new complaints. The supplemental staff report included the following information. On March 3, 2022, two complaints were received "concerning an excessive amount of flying insects causing nuisance conditions believed to originate from the Foster Farm." The following day, March 4, 2022, another complaint was received concerning "gnat looking bugs overwhelming" Mr. and Mrs. Burch's property. On March 5, 2022, Mr. Duell went to the Burch residence and observed swarms of insects. Mr. Duell went to the bunkers on the Foster Farm and observed "a significant concentration of individual swarms" of insects. Samples of the insects were

sent to an entomologist from the University of Maryland in Dorchester County who identified the insect as a "midge."

On March 8, 2022, Mr. Duell and Mr. Schmidt "observed extremely large populations of the flying insects 'midges' swarming as they traveled" to the Foster Farm. Mr. Duell and Mr. Schmidt stated that the insects did not appear to bite, "but due to their abundance, they can cause nuisance conditions as complainants complain of midges getting into eyes, noses, mouths as well as into their houses." On March 11, 2022, Mr. Duell and Mr. Schmidt met with Mr. Banks, Arthur, and Arthur Foster III at the Foster Farm and saw swarms of midges near the bunkers. During the meeting, Mr. Banks and the Fosters denied that the Foster Farm was the sole source of the midge infestation.

Later in March of 2022, more complaints concerning the midge infestation were received. On March 23, 2022, samples of live insects were collected and sent to an entomology professor at the University of Maryland for testing. On April 15, 2022, the entomologist advised that there were four species of midge in the sample, and identified the "seedling bean midge" as the overwhelmingly dominant species. On May 3, 2022, the entomologist received an email from the Research Director of the Walter Reed Biosystematics Unit of the Department of Entomology at the Smithsonian Institution stating that an examination of the samples collected on March 23, 2022, identified the dominant species as a "Chironomid midge species, Smittia aterrima (Meigen)" and that "these midges can be numerous at certain times of the year, but do not bite, and do not spread any disease." On September 16, 2022, in response to an inquiry from Mr. Schmidt concerning the life cycle and origin of midges, the Research Director sent Mr. Duell and

Mr. Schmidt an email stating that "it was most likely that the midge species was already present in the soils at the farm[,]" and that "[t]he addition of the sludge caused a boost in the bacterial components and nutrients that would have improved the survival of the midge eggs and larva leading to an increase in the midge population."

In October of 2022, residents sent Mr. Duell and Mr. Schmidt additional complaints, photographs, and videos pertaining to large swarms of the insects.

**Subsequent Proceedings Before the Board**

In response to the new complaints, Respondents' counsel submitted to the Board a memorandum dated October 27, 2022, arguing that there was no direct evidence that the midges were caused by application of the biosolids and soil conditioners to the Foster Farm or from the storage of any of the materials on the farm. Respondents' counsel contended that, even if the midges had originated from the Foster Farm, Respondents were protected under Talbot County's RTF ordinance from nuisance complaints related to pests that do not create a danger to health or safety.

On November 15, 2022, the Board reconvened to conduct its deliberations in public. The Board's attorney stated that a copy of the supplemental staff report had been received into evidence along with the October 27, 2022 memorandum from Respondents' counsel. Although the members of the Board discussed the evidence, no testimony was taken and counsel for the parties did not present argument.

At the conclusion of the session, the Board voted, by a majority of two to one, that application of the materials at issue is a generally accepted agricultural practice and, in a unanimous vote, that the storage of the materials is a generally accepted agricultural

practice.

## The Board's Findings and Decision

On December 14, 2022, the Board issued a written opinion titled "Findings and Decision," explaining its resolution of the case. In a section of the decision labelled "Statement of the Case," the Board stated that the matter had been brought "under Talbot County's Right to Farm Ordinance, Chapter 128." The Board explained that, under the County's RTF ordinance, TCC § 128-5(C), it was required to decide whether a particular agricultural practice does or does not conform to generally accepted agricultural practices, and that, if it found that a practice did not conform to generally accepted agricultural practices, it could recommend alternative practices which do conform. The Board stated that it had identified what it described as two related issues to be resolved: (1) "whether Denali soil conditioners that were stockpiled on the Foster Farm in 2021 conform to a generally accepted agricultural practice"; and (2) "whether Denali soil conditioners that were applied to the soil on the Foster Farm in 2021 conform to a generally accepted agricultural practice."

In a section of its opinion titled "Summary of Testimony," the Board summarized the County's investigation into the complaints concerning the odor, and the testimony,[12]

---

[12]The Board summarized the testimony of four expert witnesses who testified at the hearing as follows. Tom Phillips, a State of Maryland chemist, testified that soil conditioners are applied once annually, and that the popularity of soil conditioners like those supplied by Denali is increasing because traditional fertilizers are becoming more expensive. Howard Callahan of MDA's Nutrient Management Program testified that he visited the Foster Farm and reviewed the nutrient management plan and did not find evidence of wrongdoing. Brian Coblentz, the Division Chief of MDE's Compliance

other evidence, and arguments of counsel from the hearing.  In a section of the opinion titled "Findings of Fact and Decision," the Board found that "the application and stockpiling" of the Class A biosolids and soil conditioners (Mountaire, Valley, and Seawatch) "during certain times in 2021[] on the Foster Farm" were "generally accepted agricultural practice[s.]"  The Board explained that TCC § 128-2 defines "agricultural land" as land that has been used as an agricultural operation continuously for one year.  The Board found that the Foster Farm is agricultural land under TCC § 128-2.  The Board stated that "[w]hile Mr. Foster has owned this farm parcel since 2020, he has owned and operated a larger agricultural operation, which includes this farm parcel, for a much longer period of time."

The Board found that, in 2021, "Denali entered into an agreement with the owners and operators of the subject property to apply bio solids and soil conditioner products to fields owned by Arthur L. Foster, Sr."  The Board determined that, in the fall of 2021, Denali products were applied and stockpiled on the Foster Farm, creating an odor, and that "the cause of the strong odor is twofold."  First, the Seawatch soil conditioner, which is made up, in part, of processed clams, was the product that caused the most offensive odor.  Second, the Seawatch soil conditioner was applied using a "turbo-till methodology[,]" which is "an acceptable method of applying nutrients to soil but, had the application been

Division, testified that, once the generation of Class A biosolids is approved, farmers can store and use the materials as they see fit.  According to Mr. Coblentz, MDE investigates complaints when materials are stockpiled and not used, for example, over a year.  Dwight Dotterer of MDA's Nutrient Management Program testified that the nutrient management program permits temporary storage of manures, biosolids, and other materials but that MDA requires materials to be spread in the spring of the following year.

- 22 -

made by a discing technology, the material would have been applied deeper into the soil, which would have helped reduce the odor."

According to the Board, because the cost of fertilizers is becoming more expensive for local farmers, products used by Denali are "an attractive, economically beneficial alternative." Nonetheless, the Board stated that it was "sympathetic to the concerns of the complainants[,]" explaining:

> [The Board] does not take lightly that there are numerous individuals who suffered, for months, by the application of the Sea Watch product. The general health of many individuals was impacted. The smell of the product infiltrated people's homes, cars, and clothes. There is no doubt that these same individuals could not enjoy the outdoors while the smell was lingering. While there is no concrete evidence that the materials are linked to an increase in midge insects in the area, the anecdotal witness testimony suggests that there may have been a connection.

The Board stated that Denali and the Foster Farm had "conceded" that Seawatch "was particularly noxious and that deeper tilling would generally alleviate strong odors from nutrient applications in the future." The Board noted that Denali and the Foster Farm agreed not to use Seawatch on the Foster Farm in the future and that they would use the discing method when applying other materials. The Board determined that it was "satisfied that this process has resulted in steps being taken to resolve the dispute between the Foster Farm and its neighbors."

The Board stated that it had "not found evidence to conclude that application and stockpiling of materials on the Foster Farm were not agriculturally acceptable methods at the time they were employed" and stated that the practices "were in compliance with MDA's nutrient management program." The Board stated:

It is also the experience of this Board that the stockpiling of nutrients is common and acceptable practice. Under current regulations, materials must be stored, and not applied, during certain months of the year. Traditionally, the stockpiling of nutrients was from materials that were generated on the farm itself. Farmers have also traditionally imported materials, such as poultry manure, for the purpose of stockpiling and later applying those nutrients. In short, the materials have to go somewhere when the regulations prohibit their application into the soil.

The Board made the following recommendations, which were adopted, "in part, by concessions made by the Foster farm and Denali throughout this process":

1. The Sea Watch soil conditioner should no longer be accepted at the Foster Farm or any other farm operated by Denali in Talbot County.

2. The Foster Farm and Denali should continue to work in coordination with the Talbot County Conservation District for best practices to store/stockpile Class A Biosolids and organic soil conditioners.

3. The No-till "Turbo Till" method should not be used if/when-organic soil conditioners or biosolids are land applied at the Foster farm in the future.

At no point in the Findings and Decision did the Board make any findings or recommendations based on CJ § 5-403 or mention CJ § 5-403 at all.

**Proceedings in the Circuit Court**

On December 14, 2022, Petitioners filed a petition for judicial review of the Board's decision in the circuit court. Petitioners filed a Memorandum in Support of Petition for Judicial Review, and Respondents filed an Answering Memorandum in Opposition to Petition for Judicial Review. On April 20, 2023, the circuit court conducted a hearing at which it heard argument from the parties.

On June 15, 2023, the circuit court issued a memorandum opinion, and an order titled "Final Judgment on Appeal and Order Reversing the Talbot County Agricultural

- 24 -

Resolution Board's Decision Dated December 14, 2022, and Remanding the Matter for Further Proceedings." In the order, the circuit court reversed the Board's decision, remanded the matter to the Board with instructions to find that the agricultural operations on the Foster Farm were not in existence for one year or more when the complaints were filed, and stated that Respondents' "property or farming operation does not benefit from any rebuttable presumptions under Chapter 128 of the Talbot County Code or limit any action under [CJ] § 5-403(c)."

In the memorandum opinion, the circuit court determined that application of soil conditioners on the Foster Farm is an agricultural operation within the context of TCC § 128-2 because it involves the spreading of manure, lime, fertilizer, and other soil nutrients. Applying the one-year time requirement set forth in CJ § 5-403(c) concerning whether an agricultural operation has been "in existence for at least one year before the complaints were filed by the Petitioners[,]" the circuit court ruled that the Board's determination regarding the time that the agricultural operation had been in existence should have focused only on the use of the Foster Farm and not the time that Respondents may have been operating farms.[13] The circuit court stated that the use of the terms "zoning" and "nuisance" in CJ § 5-403(c) indicates "that the section applies to site specific land use for agricultural operations." The circuit court found that, although Respondents and Denali

---

[13]The circuit court stated that "[i]nstead of focusing on the use of the land, the Board looked at the operators" and had found that "Respondent had been in agriculture for many years and had been using the application of Soil Conditioners for some time before purchasing Foster Farm."

- 25 -

had conducted agricultural operations for over a year, "the nuisance complained of did not exist until Respondent[s] contracted with Denali to store and apply the Soil Conditioners on Foster Farm." The circuit court determined that the undisputed evidence showed that Respondents "had not been conducting an agricultural operation on Foster Farm for more than a year before Petitioners began to complain." The circuit court concluded that the Board's findings "were clearly erroneous because they are a misapplication of [TCC] § 128 and [CJ] § 5-403, which is incorporated by reference into [TCC] § 128-2."

**Opinion of the Appellate Court of Maryland**

On May 30, 2024, the Appellate Court of Maryland reversed the circuit court's judgment and remanded the case to the circuit court with instruction to affirm the Board's decision. See Lewis, 262 Md. App. at 59, 316 A.3d at 585-86. The Appellate Court determined that the plain language of CJ § 5-403(c) was "ambiguous as to whether the one-year period resets when an agricultural operation changes its methodology/approach." Id. at 49, 316 A.3d at 580. The Appellate Court concluded, based on its review of the legislative history of CJ § 5-403, that "non-negligent agricultural operations – those that are compliant with the necessary regulations and that have been under way for one year or more – are shielded from nuisance claims when expanding a nutrient management program." Id. at 49-53, 316 A.3d at 580-82.

The Appellate Court determined that under the plain language of TCC §§ 128-2 and 128-3, "agricultural land may change the modality of its operations without losing [nuisance] liability protection." Id. at 54, 316 A.3d at 583. The Appellate Court stated that TCC § 128-2 does not require that a particular agricultural operation exist for one year to

- 26 -

be protected from nuisance liability and instead "requires the agricultural land to be used continuously for some type of agricultural operation for one year." Id. at 54, 316 A.3d at 583. The Appellate Court concluded that "the expanded use of soil conditioners and Class A biosolids at the Foster Farm was a protected activity under both CJ[] § 5-403(c) and TCC § 128." Id. at 54, 316 A.3d at 583 (footnote omitted).

The Appellate Court concluded that substantial evidence supported the Board's decision that storage of the materials on the Foster Farm was a protected agricultural operation under TCC § 128, and that there was substantial evidence to support a finding under CJ § 5-403(c) that the agricultural operation at the Foster Farm had been under way for one year or more when the first complaints were lodged. See id. at 55-57, 316 A.3d at 583-85. In addition, the Appellate Court determined that there was substantial evidence to support a finding that the practices at the Foster Farm did not violate the public health, safety, and welfare of the neighbors and stated that TCC § 128-1 anticipates that odors and pests are "inherent agricultural effects that are shielded from liability[.]" Id. at 56, 316 A.3d at 584.

### Petition for a Writ of *Certiorari*

On July 25, 2024, Petitioners filed a petition for a writ of *certiorari*, raising the following three issues:

1. Whether the Appellate Court erred in its interpretation and application of [CJ] § 5-403?

2. Whether the Appellate Court erred in holding that there was substantial evidence in the record to support the Talbot County Agricultural Resolution Board's decision that receiving payment for stockpiling, storing greater quantity of material than could be applied on the Foster

Farm, and applying the materials at other locations is a generally accepted agricultural activity entitled to the rebuttable presumption of [TCC] Chapter 128 or [CJ] § 5-403?

3. Whether the Appellate Court erred in applying [TCC] Chapter 128 and [CJ] § 5-403 when the court determined that the change to contracting with Denali to stockpile materials in greater quantities than could ever be applied on the Foster Farm in a farm season and to transport the materials to other farms did not substantially change the agricultural operation and did not amount to a waiver of protection under [TCC] Chapter 128 and [CJ] § 5-403?

On September 20, 2024, we granted the petition. See Lewis, 489 Md. 155, 322 A.3d 1257.[14]

## STANDARD OF REVIEW

"An agency decision based on regulatory and statutory interpretation is a conclusion of law." Carven v. State Ret. & Pension Sys. of Md., 416 Md. 389, 406, 7 A.3d 38, 49 (2010) (citation omitted). Unlike the review of an administrative agency's findings of fact, an appellate court reviews an agency's conclusions of law "de novo for correctness." Comp. of Md. v. FC-GEN Ops. Invs. LLC, 482 Md. 343, 360, 287 A.3d 271, 281 (2022) (cleaned up). "[A] court will not uphold an agency action that is based on an erroneous legal conclusion." Md. Dep't of the Env. v. Cnty. Comm'rs of Carroll Cnty., 465 Md. 169, 203, 214 A.3d 61, 81 (2019) (citation omitted). An error of law includes "whether the agency correctly interpreted an applicable statute or regulation." FC-GEN Ops. Invs. LLC, 482 Md. at 360, 287 A.3d at 281.

An administrative agency's factual findings are reviewed under the substantial

---

[14]We answer question 1 in Part I of the opinion and, due to the interrelated nature of the questions, we answer questions 2 and 3 in Part II.

evidence standard, "under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences." Carroll Cnty., 465 Md. at 201, 214 A.3d at 81 (citation omitted). "In a review for substantial evidence, we ask whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." Md. Dep't of Env. v. Anacostia Riverkeeper, 447 Md. 88, 120, 134 A.3d 892, 911 (2016) (cleaned up). Appellate review is "narrow" and "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." Md. Ins. Admin. v. State Farm Mut. Auto. Ins. Co., 451 Md. 323, 334, 152 A.3d 795, 801 (2017) (cleaned up).

**DISCUSSION**

**I. Applicability of CJ § 5-403**

Although questions involving the applicability of the one-year time requirement set forth in CJ § 5-403(c) when it is alleged that an agricultural operation includes locations other than the site of the offending practice or that a change in the nature of an agricultural operation has occurred present interesting issues, in this case, the Board did not decide any issue under CJ § 5-403. In response to complaints it received, the Board addressed questions concerning the applicability of the County's RTF law, TCC § 128. The primary question that the Board decided was whether, under TCC § 128, the use and stockpiling of the soil conditioners at the Foster Farm constituted generally accepted agricultural practices. In answering this question, the Board determined whether the Foster Farm was agricultural land under TCC § 128-2, which defines agricultural land as land that has been

used as an agricultural operation continuously for one year, not whether under CJ § 5-403(c) the Foster Farm was an agricultural operation that had been under way for at least a year before a complaint was filed against it. Even though the circuit court addressed the applicability of CJ § 5-403 and found that the Board's findings constituted an erroneous application of the statute, no question concerning the applicability of CJ § 5-403(c) had been decided by the Board, and no issue as to the application of CJ § 5-403 was before the circuit court or the Appellate Court.

As seen by the plain language of the RTF laws, the limitation of nuisance actions against agricultural operations under CJ § 5-403 and TCC § 128 hinge on different requirements. Under CJ § 5-403(c), an agricultural operation is shielded from nuisance actions if the operation "has been under way for a period of 1 year or more and if the operation is in compliance with applicable federal, State, and local health, environmental, zoning, and permit requirements relating to any nuisance claim and is not conducted in a negligent manner[.]" TCC § 128-3(A) provides that a private nuisance action cannot be maintained "with respect to an agricultural operation conducted on agricultural land" if the agricultural operation was "conducted substantially in accordance with generally accepted agricultural practices." TCC § 128-2 states that "agricultural land" is real property in Talbot County carried on the State's tax rolls as agricultural land "and all other land that has been used as an agricultural operation continuously for one year."

To be sure, TCC § 128-2 defines an "agricultural operation" as including, among other things, "use of irrigation and spreading of manure, lime, fertilizer, and other soil nutrients and/or improvements[,]" "production of fruit, vegetables, ornamentals, and other

horticultural crops[,]" and "all matters set forth in the definition of 'agricultural operation'" in CJ § 5-403(a). And, CJ § 5-403(a)(2) defines an "agricultural operation" for purposes of CJ § 5-403 as "an operation for the processing of agricultural crops or on-farm production, harvesting, or marketing of any agricultural, horticultural, silvicultural, aquacultural, or apicultural product that has been grown, raised, or cultivated by the farmer." Although TCC § 128-2 incorporates the definition of "agricultural operation" set forth in CJ § 5-403(a), it does not adopt or incorporate the provisions of CJ § 5-403(c), which set forth the grounds on which an agricultural operation may be protected from a private action alleging interference with the use and enjoyment of property, and which include the statute's requirement that an agricultural operation have been under way for a period of 1 year or more.

In its opinion, the Board did not mention or cite CJ § 5-403, let alone apply the one-year time requirement set forth in CJ § 5-403(c), which is not incorporated into TCC § 128-2's definition of an "agricultural operation."[15] In the "Statement of the Case" section of its opinion, the Board stated that the matter was brought under "Talbot County's Right to Farm Ordinance, Chapter 128." Quoting TCC § 128-5(C), the Board explained that it was required to decide whether the agricultural practice at issue conformed to generally

---

[15]We do not necessarily accept the implicit assumption of the parties, the circuit court, and the Appellate Court that the one-year requirements of TCC § 128-2 and CJ § 5-403(c) are identical. No question concerning the distinctions between the two has been briefed by the parties, however, and ultimately any particular distinction does not matter to this Court's decision to reverse. Given the nature of the Board's findings and the reasons for reversal of its decision, it is not necessary that we address any issue related to the similarity or dissimilarity of the one-year requirements.

accepted agricultural practices and that, if it found that a practice did not so conform, it could specify and recommend alternative practices that did conform. The Board identified the issues it would resolve under TCC § 128-5 as being whether stockpiling and application of the soil conditioners on the Foster Farm "conform[ed] to [] generally accepted agricultural practice[s]."

In the "Findings of Fact and Decision" section of its opinion, after setting forth TCC § 128-2's definition of agricultural land, the Board stated that it found "that the Foster farm is Agricultural Land under the provision."[16] The Board determined that it had "not found evidence to conclude that application and stockpiling of materials on the Foster Farm were not agriculturally accepted methods at the time they were employed." As such, the Board found that the application and stockpiling of the Class A biosolids and soil conditioners on the Foster Farm during certain times in 2021 were "generally accepted agricultural practice[s.]"

As explained above, CJ § 5-403 does not require that an agency or court determine whether an agricultural operation used methods or practices that are generally accepted agricultural practices. In stating that the issues to be resolved concerned whether the practices at issue conformed to generally accepted agricultural practices and finding that

---

[16]As explained below in the discussion concerning whether the Board's decision is supported by substantial evidence, this appears to be an implicit finding that the Foster Farm satisfied TCC § 128's one-year requirement. The Board noted the one-year requirement in the sentence immediately before it made the finding. Without making an explicit finding, the Board appeared to be responding to one of the primary arguments from Ms. Lewis's attorney—that the Board lacked jurisdiction under the TCC because the Fosters had not been operating the farm for at least a year before the complaints were made.

stockpiling and applying the materials to the Foster Farm were generally accepted agricultural practices, the Board explicitly resolved the complaints against the Foster Farm based on the County's RTF law, not the State's RTF law.

Although TCC § 128-2 defines an "agricultural operation" as, among other things, including all matters set forth in the definition of "agricultural operation" in CJ § 5-403(a), the Board's opinion demonstrates that the Board did not address or resolve any matter under CJ § 5-403. The question under review is whether the Board's finding under TCC § 128-5(C)(3) that the use and stockpiling of biosolids and soil conditioners at the Foster Farm "are conducted in a manner consistent with generally accepted agricultural practices[,]" TCC § 128-4(A), is legally correct and supported by substantial evidence, not whether the Board's finding satisfied CJ § 5-403(c)'s one-year requirement, which is a matter not addressed by the Board. Even though the circuit court may have addressed the applicability of CJ § 5-403, it is not the circuit court's decision that is subject to appellate review. See Carroll Cnty., 465 Md. at 201, 214 A.3d at 80 ("In an appeal of the circuit court's review of an agency action, an appellate court reviews the agency's action itself rather than the decision of the circuit court." (Citation omitted)).

For the reasons above, we reverse the Appellate Court's holding with respect to the interpretation and application of CJ § 5-403.

## II. Whether the Board's Decision under TCC § 128 was Supported by Substantial Evidence

After careful review of the record, we hold that the Board's decision that the application and stockpiling of Class A biosolids and soil conditioners at the Foster Farm

- 33 -

are generally acceptable agricultural practices under TCC § 128 is not supported by substantial evidence. We conclude that it is not clear from the Board's opinion that the Board considered whether stockpiling or storing of greater quantities of materials than that which could be applied at the Foster Farm is a generally accepted agricultural practice and that there is insufficient information in the record for the Board to have determined that this is a generally accepted agricultural practice. In addition, the Board failed to make a determination, as required under TCC § 128-2, as to whether the stockpiling and use of materials at the farm violated public health, safety, and welfare, which precludes a determination that the Board's decision is supported by substantial evidence. For these reasons, we hold that the Board's decision that the stockpiling and application of materials at the Foster Farm and other locations are generally accepted agricultural practices is not supported by substantial evidence.

In both the February 2022 memorandum to the Board and at the hearing, Respondents' counsel acknowledged that the Denali materials stored at the Foster Farm constituted greater amounts than what could be used at the farm itself. The Board's findings, however, do not demonstrate that the Board considered whether the stockpiling of the materials supplied by Denali to the Foster Farm for use at that location as well as at other farms allegedly owned or operated by Respondents is a generally accepted agricultural practice. Although in its opinion the Board referred to Respondents' storage practice as "stockpiling[,]" the Board did not define or describe what it meant by the word "stockpiling." In finding that "stockpiling" was a generally accepted agricultural practice, the Board made no distinction between the quantity of materials stored for use at the Foster

Farm and the quantities stored for use at other farms. There were no findings concerning the number, location, or size of the other farms, or concerning the quantity of the materials stockpiled for use at the other locations or that the storage of such quantities was a generally accepted agricultural practice.

Although the Board found that Mr. Foster owned the Foster Farm since 2020 and that he had owned and operated a larger agricultural operation, which the Board seemingly determined satisfied the one-year time period under TCC § 128-2, the Board made no findings as to the facts concerning the larger agricultural operation it referred to. There were no findings as to what the larger agricultural operation consisted of or whether the other farms that the materials being stockpiled for use at were actually owned or operated by Mr. Foster (and later Respondents) and were part of the larger agricultural operation. In fact, the Board made no explicit finding that it accepted Respondents' counsel's representation that the other farms that the materials were being stockpiled for were owned by the Foster family. Nor was there a description provided by the Board of what it deemed the terms "owned" or "operated" to mean with respect to the larger agricultural operation. The other farms or fields that materials were being stockpiled for went unidentified except that they were said to be owned or operated by Mr. Foster or the Foster family and the larger agricultural operation that the Board referred to was undefined.[17]

---

[17]In the section of the Board's opinion titled "Summary of Testimony," under "1. County Investigation," the Board summarized the joint investigation conducted by Mr. Duell and Mr. Schmidt. In this part of the opinion, the Board noted that, as a solution to the odor problem, Denali and the Foster Farm had offered several solutions. The solutions included that "[a]ll biosolids and soil conditioners currently stored in the concrete bunkers

In its opinion, the Board referenced TCC § 128-2's definition of "agricultural land," and found that "the Foster Farm is Agricultural Land under the provision." The Board explained in one sentence that "[w]hile Mr. Foster has owned this farm parcel since 2020, he has owned and operated a larger agricultural operation, which includes this farm parcel, for a much longer period of time." The Board did not make an explicit finding as to whether it found that the Foster Farm satisfied the definition of "agricultural land" because it was real property carried on the tax rolls as agricultural land or because it was other land that had been used as an agricultural operation continuously for one year. Given its explanation that Mr. Foster had owned and operated the Foster Farm since 2020 and a larger agricultural operation for a longer period of time, it appears that the Board found that the Foster Farm satisfied the second part of the definition of "agricultural land," which sets forth the one-year requirement. But, the Board did not make an explicit finding as such and its cryptic explanation gave the impression that it included locations other than the Foster Farm in determining that the definition of agricultural land was met. As explained above, the Board made no findings about any other locations or the larger agricultural operation to which it referred.

The Board's conclusion that the Foster Farm satisfied the definition of "agricultural land" under TCC § 128-2 is not supported by substantial evidence as the Board's determination is not based on a finding that the land is carried on the county's tax rolls as

at the farm will be hauled off site for utilization on other farms owned by Mr. Foster." The proposed solution offered by Denali and the Foster Farm was neither a finding of fact by the Board nor one of the Board's recommendations which it adopted, in part, based on concessions made by the Foster Farm and Denali.

agricultural land and the Board made no express finding that the land had been used as an agricultural operation continuously for one year. To the extent that the Board appeared to imply that the one-year requirement was satisfied, its decision is not supported by substantial evidence as: (1) the Board found that Mr. Foster purchased the Foster Farm in March 2020 and Denali began delivering its products to the Farm in January 2021, which is a period of less than one year; and (2) there is no information in the record concerning the "larger agricultural operation" that the Board referred to in making its finding. There is a real question as to whether locations other than the Foster Farm could be included in calculating the one-year period of continuous operation required under TCC § 128-2, and the Board's opinion contains no discussion concerning how the one-year period was calculated and sets forth no findings whatsoever about the other locations.

In addition, the Board made findings based on what it described as its "experience"[18] that stockpiling nutrients is a common and acceptable practice, without providing a description or definition of the practice. The Board stated that, traditionally, "the stockpiling of nutrients was from materials that were generated on the farm itself[,]" and that "[f]armers have also traditionally imported materials, such as poultry manure, for the purpose of stockpiling and later applying those nutrients." Based on these statements, it appears that the Board determined that because, in its experience, stockpiling materials generated from a farm itself or stockpiling imported materials like poultry manure is a

---

[18]Although TCC § 128-4 requires that two members of the Board come from the "agricultural community" and it may be anticipated that the members would draw on their own experience in making findings, the Board's decisions must nonetheless be supported by substantial evidence in the record.

generally accepted agricultural practice, the stockpiling in this case, which involved storing materials such as soil conditioners and biosolids supplied by a source other than the farm in a quantity greater than that to be used at the farm itself, is therefore a generally accepted practice. The Board's decision leaves unclear if it considered whether the stockpiling of materials imported to a farm for use at other locations is a generally accepted agricultural practice and if it considered the nature of the materials at issue and the circumstances of the materials being stockpiled and used at the Foster Farm and other locations, *e.g.*, the quantity of the materials, amount of payment, health effects, etc.

To be sure, the Board stated that, in 2021, "Denali entered into an agreement with the owners and operators of the subject property to apply bio solids and soil conditioner products to fields owned by Arthur L. Foster, Sr." Noticeably absent from the Board's opinion, however, is any information about whether the fields were part of the Foster Farm or other locations, what the terms of the agreement between Denali and Mr. Foster provided for, and the quantity of biosolids and soil conditioner to be supplied, used, or stockpiled at the farm. Also absent from the evidence submitted to the Board is evidence of any written contract or agreement between Denali and Mr. Foster or Respondents, and the terms of the contract or agreement.[19] At oral argument before this Court, when asked whether there

---

[19]Petitioners contend that the complained-of activity at the Foster Farm constituted a "commercial" activity, rather than an agricultural operation, and that by engaging in a commercial activity Respondents waived the protection afforded by TCC § 128. For their part, Respondents contend that the agreement with Denali did not change the nature of the agricultural operation at the Foster Farm but changed only the materials that were used as fertilizers. In our view, any question as to whether the Foster Farm was engaged in commercial activity as a result of an agreement with Denali rather than an agricultural

was a written contract between Denali and Mr. Foster, Respondents' counsel indicated that he did not know whether the agreement was verbal or written and stated that the record of the hearing before the Board did not include the agreement. In short, when Respondents' counsel was given an opportunity at oral argument to state whether a written contract exists or not, he did not provide a clear answer.[20]

In addition to there being a lack of information in the Board's opinion concerning matters such as the quantity of material being stockpiled at the Foster Farm, the other locations the materials were intended for use at, and the terms of any agreement or contract with Denali for provision of the materials, the Board's opinion did not make a finding as to whether the stockpiling of the materials for use at the Foster Farm and other farms and the use of the materials violated the public health, safety, and welfare. Under TCC § 128-2, to be found a generally accepted agricultural practice of an agricultural operation, a practice must not violate public health, safety, and welfare. TCC § 128-1(B) provides that Chapter 128 "shall not in any way restrict or impede the authority of the state or County to protect the public health, safety, or welfare." TCC § 128-1(C) states that the public interest is served by having agricultural operations "that follow standard and generally accepted agricultural practices and do not endanger public health and safety." It is clear that, under TCC § 128, generally accepted agricultural practices are those that do not violate public

---

operation is part and parcel of the question of whether the practices at issue are generally accepted agriculture practices under TCC § 128.

[20]Given counsel's response to the Court's question concerning the existence of a contract, we have no reason to believe that a remand for additional factfinding would provide an answer to the question of whether a contract exists or what the terms of any agreement between Denali and Foster Farm might have been.

health and safety standards.

In its opinion, although the Board observed that the practices employed by Respondents affected the health of nearby residents, it made no finding as to whether the practices violate public health, safety, and welfare.[21]  The Board acknowledged that the Denali products applied to the soil "created what has been described by numerous witnesses as strong and unbearable [odor] to the extent it greatly affected the health and enjoyment of nearby residents and individuals who work in the immediate area."  The Board stated that it was "sympathetic" to the complaints and did not take lightly that "numerous individuals [] suffered, for months[.]"  The Board found that "[t]he general health of many individuals was impacted[,]" the odor "infiltrated" homes, cars, and clothes, and the individuals "could not enjoy the outdoors while the smell was lingering."  These findings indicate that the health, safety, and welfare of neighboring residents were impacted; yet, the Board made no explicit finding concerning whether the practices employed by Respondents violate public health, safety, and welfare.  Indeed, some of the Board's statements, described above, come very close to a finding that public health, safety, and welfare was violated, yet the Board made no explicit finding one way or the other.  As

---

[21]In a dissenting opinion, the Board member who voted "no" as to the issue of whether application of the materials is a generally accepted agricultural practice stated:

> If the question of whether a practice is a generally accepted practice, the measurement should weigh the outcomes of the practice.  In this instance, the outcome resulted in a stench, and possibly increase in insects, that are out of bounds.  Therefore, from this perspective, it cannot be stated that the application of the Sea Watch product on the Foster farm was a generally accepted agricultural practice.

such, the Board's determination that the practices at issue are generally accepted agricultural practices under TCC § 128-2 omits a finding that is required under the statute and is neither legally correct nor supported by substantial evidence.[22]

Also relevant here is that in finding that the stockpiling and application of the materials were generally accepted agricultural practices, the Board stated that it had "not found evidence to conclude that application and stockpiling of materials on the Foster Farm were not agriculturally acceptable methods at the time they were employed." In so stating, the Board appeared to have required the production of evidence demonstrating that methods used by the Foster Farm were not generally accepted agricultural practices. TCC § 128 does not place the burden on a complainant to demonstrate that an agricultural operation is not in conformance with generally accepted agricultural practices. Our reading of TCC § 128 is that the burden of proof rests with the farm or the operation at issue to

---

[22]TCC § 128-2 does not define what "public health, safety and welfare" means within the definition of generally accepted agricultural practices. Black's Law Dictionary defines "public health" as "[t]he health of the community at large" and "[t]he healthful or sanitary condition of the general body of people or the community en masse; esp., the methods of maintaining the health of the community, as by preventive medicine and organized care for the sick." *Public Health*, Black's Law Dictionary (12th ed. 2024). "Public safety" is "[t]he welfare and protection of the general public, usu[ally] expressed as a governmental responsibility[.]" *Public Safety*, Black's Law Dictionary (12th ed. 2024). "General welfare" means "[t]he public's health, peace, morals, and safety[,]" and "public welfare" means "[a] society's well-being in matters of health, safety, order, morality, economics, and politics." *Welfare*, Black's Law Dictionary (12th ed. 2024). The Board's comments—including that "[t]he general health of many individuals was impacted" and the Denali products created an odor that "greatly affected the health" of residents in the area—demonstrate that it, essentially, found that the practices at issue had a negative impact on the health, safety, and welfare of the community.

demonstrate that it meets the definition of an agricultural operation conducted in accordance with generally accepted agricultural practices. TCC § 128-3(A) provides:

> A private action may not be sustained with respect to an agricultural operation conducted on agricultural land on the grounds that the agricultural operation interferes or has interfered with the use and enjoyment of property, whether public or private, if the agricultural operation was, at the time the interference is alleged to arise, conducted substantially in accordance with generally accepted agricultural practices.

After the Board makes a determination as to whether a practice is a generally accepted agricultural practice, on review, the question is whether the Board's decision is supported by substantial evidence in the record not whether there is a lack of evidence in the record demonstrating otherwise.[23]

In this case, we have reviewed the testimony and evidence submitted at the hearing before the Board and conclude that the Board's decision is not supported by substantial evidence. Given the insufficiency of the Board's findings and lack of evidence in the record supporting its decision that the practices of stockpiling Class A biosolids and soil conditioners on the Foster Farm and using the materials at the farm and other farms allegedly owned or operated by Respondents are generally accepted agricultural practices as defined by TCC §128-2, we reverse the judgment of the Appellate Court and the decision

---

[23]TCC § 128-5(C)(3) provides that the Board's decision as to whether a particular agricultural practice does or does not conform to generally accepted agricultural practices "creates a rebuttable presumption which shall be admissible in evidence in any subsequent civil proceeding the Circuit Court arising out of the matters set forth in the complaint." During oral argument, there were questions from the Court concerning whether a local ordinance can authorize an evidentiary presumption that is not set forth in State law. The issue was not raised by either party. Accordingly, the Court will not address the matter.

of the Board.[24]  Respondents are not entitled to a rebuttable presumption under TCC § 128-5(C)(3) in any subsequent civil proceeding in the circuit court that its practices conform to generally accepted agricultural practices.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED.  RESPONDENTS TO PAY COSTS.**

---

[24]As an alternative to reversal, we considered remanding the case for further proceedings and factfinding, but neither party has asked for a remand and there is no reason to believe that a remand is warranted.  On brief, Petitioners ask that this Court reverse the Appellate Court's and the Board's decisions and do not recommend a remand as an alternative, and Respondents, of course, request that the decisions be affirmed.  Respondents' ability to present evidence at the hearing before the Board was not restricted in any way.  Remanding the case for an additional evidentiary hearing before the Board would essentially permit Respondents a second opportunity to present evidence to the Board that could have been presented previously.

Circuit Court for Talbot County
Case No. C-20-CV-22-000143
Argued: January 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 25

September Term, 2024

_____

IN RE: FOSTER FARM

_____

Fader, C.J.,
Watts,
Biran,
Gould,
Eaves,
Killough,
McDonald, Robert N. (Senior
Justice, Specially Assigned),

JJ.

_____

Concurring Opinion by McDonald, J.

_____

Filed:  July 30, 2025

I join the thorough Majority Opinion. I write simply to clarify the function of the Talbot County Agricultural Resolution Board under the County right-to-farm law.

It perhaps goes without saying that, in our judicial review of an administrative board's decision, we "look through" the intervening opinions of the circuit court and Appellate Court and review directly the decision of the administrative board – in this case, *In re Foster Farm*, ZV-21-3156-FOS (Tal. Co. Agri Res. Bd. Dec. 14, 2022).[1] Nevertheless, it may be useful to point out a distinction from the reported decision of the Appellate Court – in this case, *In the Matter of Cheryl Lewis, et al.*, 262 Md. App. 32 (2024).

The Appellate Court decision states that the Talbot County Agricultural Resolution Board found that the Foster Farm had followed "generally accepted agricultural practices" and thereby determined that the Foster Farm was "immune" from a common law tort action. 262 Md. App. at 40, 54, 56. The Appellate Court decision thus suggests that the Board had authority to decide the ultimate question of the Foster Farm's immunity from tort liability and in fact did so.

To its credit, the Board itself did not purport to reach that question in its administrative decision. The Talbot County right-to-farm law does not authorize the Board to confer immunity on a farm operation. As the Majority Opinion in this Court indicates, the County right-to-farm law provides that the Board's findings that a farm operation complies with generally accepted agricultural practices would establish a "rebuttable

---

[1] *E.g.*, *Zukowski v. Anne Arundel County*, 490 Md. 243, 262 (2025).

presumption" that is "admissible in evidence" in any later tort action filed in a circuit court. Majority slip op. at 10-11. (The Appellate Court decision does not mention this aspect of the County right-to-farm law). Obviously, a *rebuttable* presumption is one that is subject to being rebutted in the subsequent court action. A Board decision that a farm operation is entitled to such a rebuttable presumption is, by definition, not a conclusive determination that the farm operation is immune from tort liability under a right-to-farm law. That issue would be decided in any subsequent tort action in which that defense is raised.

Thus, contrary to the Appellate Court's assumption, the Board's findings in this case did not establish that the Foster Farm was necessarily immune from tort liability, but at best provided it with a rebuttable presumption admissible in evidence to support such a defense.[2] In light of this Court's decision to reverse the Appellate Court and the decision of the Board, the Foster Farm would not be entitled to that rebuttable presumption in any subsequent civil proceeding. *See* Majority slip op. at 43.

---

[2] It is questionable under the Maryland Constitution whether a county – even a charter county like Talbot County – has the power to create an evidentiary presumption and declare it "admissible" in a common law tort action in a circuit court. *See* Maryland Constitution, Article XI-A; Maryland Code, Local Government Article, §10-101 *et seq.* (Express Powers Act); *McCrory Corp. v. Fowler*, 319 Md. 12, 20-21 (1990) (noting limitations on county legislation affecting common law causes of action); *Gunpowder Horse Stables, Inc. v. State Farm Automobile Ins. Co.*, 108 Md. App. 612 (1996) (same); *cf.* 96 *Opinions of the Attorney General* 139, 172-73 (2011) (discussing rebuttable presumption under county "right-to-fish" law).

As the Majority Opinion notes, this issue was not briefed by the parties. In any event, it would only arise in a subsequent tort action in which a party seeks to rely on such a rebuttable presumption in arguing for immunity under a right-to-farm law.

IN THE SUPREME COURT

OF MARYLAND

No. 25

September Term, 2024

_____

IN RE: FOSTER FARM

_____

Fader, C.J.
Watts
Biran
Gould
Eaves
Killough,
McDonald, Robert N. (Senior
Justice, Specially Assigned),

JJ.

_____
_____

Dissenting Opinion by Eaves, J., which
Killough, J., joins.

_____

Filed: July 30, 2025

Respectfully, I dissent. The Court overreaches by substituting its judgment for that of the Talbot County Agricultural Resolution Board ("the Board"). I would hold that there is substantial evidence in the record to support the Board's findings that the practice of both stockpiling and applying certain biosolids and soil conditioners on Foster Farm are generally accepted agricultural practices. The Court's view that the Board failed to make *explicit* findings as to these issues is incorrect. As I outline below, the Board considered the evidence in the record before reaching its decision, and its actions comported with the Talbot County Right to Farm ("the local RTF") law set forth in Chapter 128 of the Talbot County Code ("TCC").[1]

The TCC states the purpose of the local RTF law:

> [T]o protect the right to farm or engage in agricultural interests within Talbot County; to further the efficient regulation of land use in Talbot County; and to assist in the resolution of disputes between agricultural land owners and/or farmers and their neighbors by the establishment of the . . . Board to resolve disputes concerning alleged agricultural nuisances.

---

[1] I agree with the Court that the determination of whether the Board discharged its responsibilities falls under the TCC rather than the State right to farm law, codified at Md. Code Ann., Cts. & Jud. Proc. (2020 Repl. Vol.) ("CJP") § 5-403. Therefore, I also do not analyze the Board's decision pursuant to that statute. As a factual matter, the Board's findings, conclusions, and recommendations all were based on local law, and it never cited CJP § 5-403. Indeed, at the beginning of the November 15, 2022, hearing, Board Member Young stated:

> I want to just remind everybody to begin with what the purpose of the Board is and what the purpose of this hearing is.
> *And under the county ordinance, what this Board is permitted to do is to decide whether a particular agricultural practice does or does not conform to generally-accepted practices.*

(Emphasis added).

TCC § 128-1(A). Under the local RTF law, the Board is required to "arbitrate and mediate disputes involving agricultural operations conducted on agricultural lands and issue findings concerning *whether or not such agricultural operations are conducted in a manner consistent with generally accepted agricultural practices*." TCC § 128-4(A) (emphasis added). "Generally accepted agricultural practices" are defined as:

> Methods used in connection with *agricultural operations that do not violate applicable federal, state or local laws or public health, safety and welfare* and which are generally accepted agricultural practices in the agriculture industry. Generally accepted agricultural practices include, but are not limited to, practices that are recognized as best management practices, and methods that are recommended by various governmental agencies, bureaus, and departments, such as the University of Maryland Cooperative Extension, the Talbot Soil Conservation District, and the like.

*Id.* § 128-2 (emphasis added).

Under the applicable standard of review, "[w]hen this Court or any appellate court reviews the final decision of an administrative agency, we look through the circuit court's decision and evaluate the decision of the agency." *Md. Dep't of the Env't v. Assateague Coastal Trust,* 484 Md. 399, 446 (2023). In analyzing an agency's legal conclusions, such as the interpretation of a statue (not under the purview of the agency), this Court affords the agency's interpretation no deference. *Id*. Concerning factual findings, however, this Court uses the "substantial evidence" standard, which "defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences." *Id*. at 447 (quoting *Md. Dep't of the Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 201 (2019)). This Court asks, "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id*. at 448–49 (quoting *Md. Dep't of the Env't*

2

*v. Anacostia Riverkeeper*, 447 Md. 88, 120 (2016)). This requires reviewing an agency's decision "in the light most favorable to it." *Id*. at 449. In this case, there was substantial evidence to support the Board's determinations.

**I**
**The Board's Findings**

In February 2022, the Board held a public hearing on nuisance complaints filed by neighbors of the Foster Farm. Before issuing a decision, the Board reconvened in November 2022 to receive new evidence regarding complaints submitted to the Talbot County Health Department ("the Health Department") about increases in midges. The Planning Office subsequently submitted a supplemental staff report. The following month, the Board issued its Findings and Decision. It began by noting the "two related issues that must be resolved[:]" whether (1) the materials that were *stockpiled* on Foster Farm in 2021 conform to generally accepted agricultural practices and (2) the materials that were *applied* on Foster Farm in 2021 conform to generally accepted agricultural practices.

The Board found that "both the application and stockpiling" of the materials on Foster Farm were "generally accepted agricultural practice[s]" "in compliance with [the Maryland Department of Agriculture's] nutrient management program." After reviewing the evidence, the Board found that the most pungent odor caused by the materials was from DWS Sea Watch International soil conditioner, which the Board described as "[p]articles out of wash-down water during the processing [of] clams[.]" Regarding the actual application of the Sea Watch, the Board found that it had been applied to Foster Farm via an "acceptable method of applying nutrients to the soil[,]" (the turbo tiling process) but

3

that, had a different method been used (the discing methodology), the Sea Watch would have been applied deeper underground and reduced the strength of the odor.

With respect to storage, the Board found that Foster Farm's stockpiling of the materials was for the purpose of "applying those materials to the soil in 2022[]" and that the practice of stockpiling these types of materials is "not unique to the Foster Farm." While the Board acknowledged that these practices had an effect on the "general health of many individuals[]" it stated that there was "no concrete evidence that the materials are linked to an increase in midge insects in the area[.]" At best, the Board recognized that the "anecdotal witness testimony suggests that there may have been a connection." The three-member Board then unanimously voted that Foster Farm's stockpiling of materials was a generally accepted agricultural practice and voted by a two-to-one majority that the application of the materials was a generally accepted agricultural practice.[2]

## II
## The Court's Errors

The Court faults the Board for not making explicit findings. Maj. Slip Op. at 35–36, 42. I disagree. This criticism is too dismissive of the Board's undisputed expertise in several respects and overlooks the specific findings in the record. *First*, the Board

---

[2] The lone dissenting Board member stated the following:

> If the question of whether a practice is a generally accepted practice, the measurement should weigh the outcomes of the practice. In this instance, the outcome resulted in a stench, and possibly increase in insects, that are out of bounds. Therefore, from this perspective, it cannot be stated that the application of the Sea Watch product on the Foster [F]arm was a generally acceptable agricultural practice.

concluded that both stockpiling and applying Class A biosolids and soil conditioners are generally accepted agricultural practices. This was based on several factors: (1) Maryland Department of the Environment and MDA certifications for the permitting of Class A biosolids; (2) traditional farming methods testified to by experts; and (3) the advantages and disadvantages of the turbo tilling and discing methods. Petitioners do not dispute this. Yet, the Court declares that these findings are insufficient despite the Board discussing in great detail the practice of soil conservation by the use of biosolids. The Court's finding otherwise is a clear usurpation of the Board's expertise to which we owe deference.

*Second*, the record contains ample evidence regarding the quantity and intended use of stockpiled materials, contrary to the Court's view that there is an evidentiary gap. The Court asserts that the Board made "no findings concerning the number, location, or size of the other farms or concerning the quantity of the materials stockpiled for use at the other locations or that the storage of such quantities was a generally accepted agricultural practice." Maj. Slip Op. at 34–35. The Court continues:

> There were no findings as to what the larger agricultural operation consisted of or whether the other farms that the materials being stockpiled for use at were actually owned or operated by Mr. Foster (and later Respondents) and were part of the larger agricultural operation. In fact, the Board made no explicit finding that it accepted Respondents' counsel's representation that the other farms that the materials were being stockpiled for were owned by the Foster family. Nor was there a description provided by the Board of what it deemed the terms "owned" or "operated" to mean with respect to the larger agricultural operation. The other farms or fields that materials were being stockpiled for went unidentified except that they were said to be owned and operated by Mr. Foster or the Foster family and the larger agricultural operation that the Board referred to was undefined. Denali's products (Mountaire Millsboro, Sea Watch cake, and Valley Proteins blends) were stored in bunkers only pending lawful land application.

5

*Id.* at 35. The Court points to no legal authority that requires that these products be stored only on the farms for which they will be used. Nevertheless, the Board did consider this fact, though perhaps not as exacting as the Court would prefer. The record shows that farmers routinely import external manures, from poultry and cattle, for seasonal nutrient management. Moreover, MDA provides oversight of the biosolids and soil conditioners here to ensure safety precautions have been taken and to preclude health hazards. Indeed, Denali and Foster Farm agreed that "[a]ll biosolids and soil conditioners currently stored in the concrete bunkers at the [Foster F]arm will be hauled off site for utilization on other farms owned by Mr. Foster."

*Third*, the Court's criticism of the Board's treatment of odor-related health complaints misstates the legal standard and demands a level of exactitude that neither the ordinance nor our standard of review require. The Court states that,

> The Board acknowledged that the Denali products applied to the soil "created what has been described by numerous witnesses as strong and unbearable [odor] to the extent it greatly affected the health and enjoyment of nearby residents and individuals who work in the immediate area." The Board stated that it was "sympathetic" to the complaints and did not take lightly that "numerous individuals [] suffered, for months[.]" The Board found that "[t]he general health of many individuals was impacted[,]" the odor "infiltrated" homes, cars, and clothes, and the individuals "could not enjoy the outdoors while the smell was lingering." These findings indicate that the health, safety, and welfare of neighboring residents were impacted; yet, the Board made no explicit finding concerning whether the practices employed by Respondents violate public health, safety, and welfare. Indeed, some of the Board's statements, described above, come very close to a finding that public health, safety, and welfare was violated, yet the Board made no explicit finding one way or the other. As such, the Board's determination that the practices at issue are generally accepted agricultural practices under TCC § 128-2 omits a finding that is required under the statute and is neither legally correct nor supported by substantial evidence.

6

Maj. Slip Op. at 39–40 (alterations in original).

In its Findings and Decision, however, the Board carefully summarized the testimony of each witness and considered written statements, and exhibits, and the Department's finding that there were "no health or medical information . . . to substantiate or confirm that these odors are creating or causing a condition dangerous to health or safety." Yet, the Court would have the Board reiterate this, elevating form over substance, by stating in each and every instance that something is or is not an explicit finding. But, as noted above, when it comes to factual findings under the "substantial evidence" standard, this Court "defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences." *Assateague Coastal Trust,* 484 Md. at 447 (quoting *Cnty. Comm'rs of Carroll Cnty.*, 465 Md. at 201). While that Board stated in its Findings of Fact and Decision that "[t]he general health of many individuals was impacted[,]" the only definitive finding that the Board made was that "these same individuals could not *enjoy the outdoors while the smell was lingering*." (Emphasis added). Furthermore, the Board noted that there was—at best—anecdotal testimony that the odors caused the presence of midges. A finding of an inability to enjoy the outdoors and a *possible* connection to insects falls short of refuting the Department's professional assessment that "there has been no health or medical information provided in this case to substantiate or confirm that these odors are creating or causing a condition dangerous to

7

health or safety."[3] This Court should not substitute its own judgment for that of the Department's, the agency charged with evaluating health risks, especially when the Department found no evidence supporting a dangerous health condition.

*Fourth*, the Board, as the Court correctly notes, is comprised of individuals with agricultural expertise. Maj. Slip Op. at 37 n.17. Thus, it is perplexing that the Court rejects the Board's determinations where there is substantial evidence in the record to support its findings. But even if one takes the Court at its word that the "Board made no explicit finding concerning whether the practices employed by Respondents violate public health, safety, and welfare[,]" Maj. Slip Op. at 40, the correct course of action would be to remand the matter to the Board, not to outright reverse it, *see Mayor & City Council of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 669 (2021) ("[W]here the administrative decision or order fails to supply detailed findings of fact or conclusions of law, the appropriate disposition is for the reviewing court to remand the matter to the administrative agency for further proceedings."); *Montgomery Cnty. v. Stevens*, 337 Md. 471, 486 (1995) ("[W]here the law requires an administrative agency or official to set forth findings or reasons, and the administrative record fails to reflect such findings or reasons, the appropriate remedy is a remand to the agency with directions to comply with the law."). By failing to remand, the Court declares itself the expert and substitutes its judgment—in the first instance—for that of the Board's.

---

[3] The Court notes that the TCC does not define "public health," and proceeds to use dictionary definitions to clarify what this term means. Maj. Slip Op. at 40–41 n.21. Under our standard of review, however, the Board's determination is entitled to deference.

8

The Court doubles down on this error when it notes that it contemplated remanding the matter to the Board but ultimately decided not to because "Petitioners ask that this Court reverse the Appellate Court's and the Board's decisions and do not recommend a remand as an alternative, and Respondents, of course, request that the decisions be affirmed." Maj. Slip Op. at 42 n.23. Furthermore, the Court notes that remand would be futile because Respondents' ability to present evidence at the Board was not restricted and because remanding for an "evidentiary hearing before the Board would essentially permit Respondents a second opportunity to present evidence to the Board that could have been presented previously." *Id.* The Court misunderstands its own conclusions. The issue is not that there was a lack of evidence presented on the issue; rather, the issue—as the Court has stated it—is that the Board did not make a particular finding. A remand from this Court for the Board to issue supplemental findings would not necessarily require a new hearing to present additional evidence. While attempting to avoid what it views as providing "Respondents [with] a second opportunity[,]" *id.*, the Court hands Petitioners a premature victory and creates an impractical precedent that undermines the importance of expert agencies, such as the Board.

### III
### Conclusion

This was the Board's first foray into applying the local RTF since its creation. The Court should not equate our "substantial evidence" standard with perfection. Indeed, the Board managed to resolve the most critical points of contention between the parties: (1) discontinuing use of the Sea Watch soil conditioner, which caused the most offensive odor,

9

(2) requiring that biosolids and soil conditioners be placed deeper into the soil via the discing method rather than turbo tilling, and (3) requiring Foster Farm and Denali "to continue to work in coordination with the Talbot County Conservation District for best practices to store/stockpile Class A Biosolids and organic soil conditioners." The Board faithfully hewed to the purpose of the local RTF law:

> [T]o protect the right to farm or engage in agricultural interests within Talbot County; to further the efficient regulation of land use in Talbot County; and to assist in the resolution of disputes between agricultural land owners and/or farmers and their neighbors . . . by resolv[ing] disputes concerning alleged agricultural nuisances.

TCC § 128-1(A). For these reasons, I respectfully dissent and would affirm the judgment of the Appellate Court. Justice Killough has authorized me to state that he joins in this dissenting opinion.

10